UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 09-10243-MLW |
| | ) | |
| RYAN HARRIS | ) | |
| | ) | |

**GOVERNMENT'S OPPOSITION
TO DEFENDANT'S SENTENCING MEMORANDUM**

The parties agree that the appropriate sentencing guidelines range for defendant Ryan Harris is 70 to 87 months, based on an offense level of 27. The Government recommends that the Court impose a 70-month prison sentence, which is at the low-end of that range, rather than the year-and-a-day sentence that the defendant recommends. As set forth below, the Section 3553 factors support the imposition of a 70-month sentence.

**1. Nature and circumstances of offense**

This case is, at its core, about stealing large sums of money. Harris committed a high-tech variation of a brick-and-mortar theft: in essence, he created, and then sold to others, the combinations to other people's bank safes. He then used the combinations himself to steal money out of the safes for his own use, and he encouraged, and fully intended for, his purchasers to do the same. In this case, Harris, a sophisticated computer hacker, designed, and then sold to others, hacked cable modems, intending for them to steal internet service from Internet Service Providers ("ISPs"). He then personally used his hacked cable modems to steal service for himself, and he encouraged, and intended for, his purchasers to do the same.

1

Harris's crime spree lasted over six years. During that timeframe, as he acknowledges in his guidelines calculation, he took in almost $1 million in sales revenues. (See Defendant's Sentencing Memo, p. 2). As discussed further below, Harris caused exponentially more harm to ISPs around the world, in the form of millions of dollars in lost subscriber revenues. He also imposed significant costs, as the ISPs and modem manufacturers spent a substantial amount of time, and therefore money, implementing new security measures. (See Attachment A, Charter Communications Victim Statement, and Attachment B, Motorola Victim Statement).

The evidence at trial established that Harris was the mastermind of this theft operation. (Indeed, he acknowledges as much in his guidelines calculation, which contemplates a four-level enhancement for leader/organizer. See Defendant's Sentencing Memo, p. 2). He called himself "the creator." (Trial Ex. 21, chat between Harris and "MooreR"). He said, "I created the entire cable modem hacking scene" (Trial Ex. 18, chat between Harris and "Killswitch"), and if "I didn't exist, there would be no cable modem hacking." (Trial Ex. 28, Private Messages from Harris).

The evidence also established that Harris acted with unabated malice. He declared "war" against the ISPs and then served as the Commander-in-Chief of his troops. Harris dedicated his *Hacking the Cable Modem* book to all "the righteous hackers that have been silenced by greedy corporations," and he said his "goal was clear: I wanted to uncap as many cable modems as possible! The war had begun." (Trial Ex. 7, *Hacking the Cable Modem* book, inside cover & p. 3). Furthermore, Harris knew full well that he was committing a crime. As established at trial, Harris, using the online moniker "DerEngel," (for "the Angel"), went to great lengths to hide his true identity and whereabouts.

Although Harris has repeatedly argued that this case is somehow novel, in fact, there have been dozens and dozens of prosecutions spanning several decades that are of the same ilk. These include the legion of "blue box" phone service theft prosecutions of the 1970s, followed by numerous "descrambler/converter" cable and satellite t.v. programming theft prosecutions in the 1990s.[1]

Harris not only acted with malice and disregard for the law, he also acted with insatiable greed. He was determined not only to punish the ISPs but to get rich doing so. As he said to Craig Phillips, "we will start on our path to becoming Millionairs" [sic] . . . and "were [sic] gonna make so much . . . money . . . and then were [sic] gonna buy a really nice house with a . . . . POOL . . . :D" (Trial Ex. 5, p. 13-14, chat between Harris and Craig Phillips).

Ultimately, Harris's self-styled "war" was quite effective: he caused widespread financial injury to ISPs and modem manufacturers. (See Attachment A, Charter Communications Victim Statement, and Attachment B, Motorola Victim Statement). The evidence at trial established that Harris, by his own estimation, sold to over 15,000 purchasers. (Trial Ex. 2, TCNiSO website screen shots). He intended to sell almost twice that number, as he tried to close a deal to sell thousands of additional Sigma licenses

---

[1] In the 1990s, there were a number prosecutions of individuals who designed and sold modified satellite t.v. and cable t.v. "descramblers" or "converters." United States v. Manzer, 69 F.3d 222 (8th Cir. 1995), United States v. Coyle, 943 F.2d 424 (4th Cir. 1991). Even before the descrambler cases, in the 1970s there were prosecutions of individuals who designed and sold "blue boxes" that enabled telephone users to by-pass the telephone companies' electronic circuitry and make telephone calls without paying the required tolls. See United States v. Patterson, 528 F.2d 1037 (5th Cir. 1979). See also Lawlor, James, "Federal Criminal Prosecutions under Wire Fraud Statute for Use of 'Blue Box' or Similar Device Permitting User to Make Long-Distance Telephone Calls Not Reflected on Company's Billing Records," 34 A.L.R. Fed. 278 (West 2009) (citing a list of circuit court published decisions involving § 1343 charges).

where he would also teach the purchasers how to steal service. The evidence at trial showed that when Craig Phillips told Harris, "they want to use these [10,000 Sigma software licenses] to steal service . . . we have to show them how to steal service too," Harris nonchalantly responded, "sounds good to me . . . [expletive] for 20k man, ill [sic] give them UNLIMITED licenses." (Trial Ex. 5, p.12, chat between Harris and Craig Phillips).

At trial, the evidence showed that Harris was a menace to the ISPs for a prolonged period. As the Charter witness Benjamin Brodfuehrer testified, Charter was painfully aware that TCNiSO's cable modem hacking products were being used on its network. It was losing subscriber revenues and was playing a costly game of "cat and mouse" trying to block them. Brodfuehrer testified that TCNiSO had been on Charter's radar for years and that his group had already tested TCNiSO's products on its own, well before the government contacted Charter. Indeed, he testified that, for many years, Charter continued to keep tabs on and test TCNiSO's products as they kept evolving to defeat Charter's security measures. The Motorola witness, Christopher Kohler, reiterated much of the same.[2] (See also Attachment A, Charter Communications Victim Statement, and

---

[2] Harris argues in his brief that "cable companies hardly noticed that TCNiSO existed" and points to an e-mail from Motorola's counsel stating that a preliminary, "*not yet complete*" search of its records did not turn up complaints about TCNiSO. (Def. Memo, p. 8). But the defendant fails to mention that Motorola later completed its search and later produced over a dozen e-mail messages that contained complaints about Sigma and other TCNiSO products. These documents were produced to the defendant. At trial, when the defendant asked the government to stipulate to the admissibility of the initial Motorola e-mail, the government responded that it would agree if the defendant agreed to stipulate to the admissibility of the dozen or so subsequent e-mails that Motorola produced that contained complaints about TCNiSO. The defendant opted instead not to seek to introduce the Motorola e-mail that it now references in its brief, and neither party introduced any Motorola e-mails.

Attachment B, Motorola Victim Statement). The forum posts and financial records show that there were dozens of other similarly-situated ISPs all over the world.

Notably, the harm that Harris caused was ultimately shared by both the ISPs and their legitimate, paying subscribers. According to Brodfuehrer's trial testimony, when people steal internet service, it can slow down, or degrade, the internet speeds for legitimate, paying customers who share the same node. (See also Attachment A, Charter Communications Victim Statement). In response to this degradation, Charter (and presumably all ISPs) has to invest additional money to build out more capacity in order to maintain internet speeds. He explained that some of these costs are then passed on to the legitimate, paying subscribers, who in turn pay higher subscriber fees.

Ultimately, the harm that Harris caused to the ISPs, modem manufacturers, and legitimate subscribers, is orders of magnitude higher than his gain. Accordingly, by substituting Harris's gain as a proxy for harm pursuant to App. Note 3(B) to USSG Section 2B1.1, the agreed-upon guidelines calculation dramatically underestimates the harm that Harris actually caused. So in effect Harris has already been afforded a substantial discount from his would-be guidelines calculation.

   **2. History and characteristics of defendant**

Ryan Harris, according to the Presentence Investigative Report, is from an intact, stable upper-middle class family. (See PSR, Part C, p. 10). He has some college education and an extensive background in computers. In short, Harris has had many advantages that other defendants have not had. He had no need to turn to a life of crime. His is not the story of a child born to drug addict parents who grew up in drug- or gang-infested slums and turned to a life of crime in order to feed his own drug addiction,

support his family, or succumb to gang pressures.  When someone as employable and well-supported as Harris has turned to crime, it seems that he did so because he wanted to.  Harris was in no way forced or pressured into this six-year crime spree.  Rather, Harris was motivated by anger and greed:  he was determined to damage the cable companies and to become a millionaire in the process.

### 3. Need for just punishment, respect for law, deterrence, and public protection

A 70-month sentence would serve both specific and general deterrence goals.  Harris acted with malice, as he carried out his personal vendetta against the ISPs.  He had a complete disregard for the law, fueled in part by his seemingly insatiable greed.  Harris's crime was not a one-time, impulsive crime of "passion" or "thrill"; rather, he engaged in a prolonged and methodical crime spree during a six-year period.  So a significant prison sentence is needed to deter Harris effectively.

Moreover, a 70-month sentence would also deter other would-be cable modem hackers, including product designers, re-sellers, and users, as well as protect the public.  It is important to get to the root of the problem by punishing those who are the most culpable for causing the wide array of harm:  those who design and distribute the cable modem hacking tools.  That is ultimately a more effective way to protect the public and to deter others than prosecuting individual users or re-sellers.

If, on the other hand, Harris were to receive a mild sentence, there is a serious risk that current and would-be cable modem hackers would continue their crimes undeterred.  They will likely continue hacking and stealing, chalking up the risk of receiving a light sentence to the "cost of doing business."  As a result, the victims, including ISPs, their

legitimate, paying subscribers, and modem manufacturers, will be exposed to continued harm.

As Judge Gertner stated in a case cited by the defendant, United States v. Watt, "As one author describes, deterrence and punishment are particularly important for cybercrimes:

> [C]ybercrimes by their very nature allow offenders to commit the offenses without leaving their homes and with a veil of anonymity. This lack of contact with the victims of their crimes and insulation from law enforcement may cause them to be under-deterred. Only successful prosecution and significant punishment will supply prospective cyber-criminals with the information needed to create real deterrence.

Richard Downing, 'Prosecution Responses to Internet Victimization: Thinking Through Sentences in Computer Hacking Cases: Did the U.S. Sentencing Commission Get It Right?,' 76 Miss. L.J. 923, 925-26 (2007)." United States v. Watt, 707 F.Supp.2d 149, 156-57 (D.Mass. 2010).

### 4. Harris's arguments are not persuasive

The defendant urges the Court to consider various factors that are not relevant sentencing considerations. The fact that Harris also could have been sued civilly by the ISPs is neither a legal defense nor a relevant sentencing factor. Likewise, the fact that certain hedge funds, investment banks, or brokerage houses have not been prosecuted is as much a red herring as the laundry list of hedge fund managers, insider traders, and brokers who have been prosecuted.

Harris also tries to focus the Court's attention on the corporate nature of the victims. Likewise, at trial, Harris tried to demonize the "greedy" cable companies and cast aspersions at Motorola's and the ISPs' security measures. But these factors are neither

7

helpful as a legal defense nor are they relevant sentencing considerations. Merely because a victim is a company, rather than a person, or is somehow regarded as unpopular, it is no less a victim. Stealing is stealing. Whether a thief steals from a person or a business, or a well-liked one or unpopular one, is not an appropriate factor for sentencing. In any case, in reality, the victims here also include legitimate, paying subscribers. Harris devised his "CoaxThief" packet sniffer to sniff innocent neighbors' internet traffic to steal their MAC addresses. Their internet service was slowed down, and their subscriber fees were increased. Likewise, whether Motorola or the ISPs could have, or should have, had tighter security is in no way relevant to Harris's sentence.

Harris also seems to urge the Court to re-calculate the sentencing guidelines using the 1987 guidelines. This argument also misses the mark. Notably, Harris's own calculation of 33-41 months under those guidelines is too low. He has failed to take into account a two-level enhancement for "special skill" that would clearly have applied under the 1987 guidelines. This would have brought his guidelines to a level 22, which correlate to a range of 41-51 months. (See 1987 USSG Section 3B1.3).

**5. Conclusion**

For the reasons set forth above, the Government urges the Court to impose a 70-month sentence. It also recommends three years of supervised release, no fine, an award of $152,320 in restitution, and a $700 special assessment.

Respectfully submitted,

                        CARMEN M. ORTIZ
                        United States Attorney

By:   */s/ Mona Sedky*
       Adam J. Bookbinder
       Assistant U.S. Attorney
       Mona Sedky
       DOJ Trial Attorney

### CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                        */s/ Mona Sedky*

Dated: June 20, 2012